# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

MARIA GUADALUPE AGUILAR
MENDOZA,

               Plaintiff,

vs.

MOISES MEDINA SILVA,

               Defendant.

No. C 13-4108-MWB

**MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S PETITION FOR RETURN OF CHILDREN PURSUANT TO THE CONVENTION ON CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION (THE 1980 HAGUE CONVENTION) AND THE INTERNATIONAL CHILD ABDUCTION REMEDIES ACT (ICARA), 42 U.S.C. §§ 11601-11610**

---

## TABLE OF CONTENTS

I.    **INTRODUCTION** ........................................................... 3
    A.    *Procedural Background* ........................................... 3
        *1.*    *Ms. Mendoza's verified complaint* ..................... 4
        *2.*    *The temporary restraining order* ...................... 4
        *3.*    *The motion to continue* ................................... 5
        *4.*    *The consolidated trial and preliminary injunction hearing* ......................................................... 7
    B.    *Initial Findings Of Fact* ....................................... 10
        *1.*    *The parties' marriage and the births of their children* ........................................................ 10
        *2.*    *Living arrangements and visits to the United States* .............. 11
        *3.*    *Separation of the parties* ............................... 13
        *4.*    *The allegedly wrongful retention of the children* .................. 14
        *5.*    *Circumstances after February 2, 2013* .............................. 18

II.   **LEGAL ANALYSIS, INCLUDING SOME ADDITIONAL FINDINGS OF FACT** ................................................. 20

    A.      *Overview Of The Convention And The ICARA* ............................. **20**
          1.     *The requesting party's burden* .............................. **23**
          2.     *The resisting party's affirmative defenses* ........................... **24**
    B.      *Ms. Mendoza's Case* ...................................................... **26**
          1.     *The date of the retention* .............................. **26**
          2.     *The children's "habitual residence".* ................................. **27**
          3.     *"Wrongful" retention.* .................................... **32**
          4.     *Summary* ................................................. **35**
    C.      *Mr. Medina's Affirmative Defenses.* .............................. **35**
          1.     *Various affirmative defenses under Articles 12, 13a*
                     *and unnumbered paragraphs, and 20* .............................. **36**
          2.     *"Consent or acquiescence" under Article 13a* ...................... **38**
          3.     *Summary* ................................................. **41**
    D.      *Mr. Medina's Request For A Delay In The Return Of The*
           *Children* ...................................................... **41**

III.   *CONCLUSION* ............................................................. **45**

P laintiff Maria Guadalupe Aguilar Mendoza, a citizen of Mexico, filed this action pursuant to the Convention On Civil Aspects Of International Child Abduction (the 1980 Hague Convention or the Convention) and the International Child Abduction Remedies Act (ICARA), 42 U.S.C. §§ 11601-11610, to secure the return of her daughters, five-year-old K.G.M.A. and four-year-old M.K.M.A., whom Ms. Mendoza alleges were, without her consent or acquiescence, wrongfully retained in the Northern District of Iowa, away from their habitual residence in Mexico, by the

children's father, defendant Moises Medina Silva. I previously enjoined Mr. Medina from removing the children from the jurisdiction of this court and to surrender the children's passports and travel documents to the Clerk of Court to maintain the *status quo* pending resolution of this case on the merits. I also set an expedited, consolidated trial on the merits and preliminary injunction hearing for November 18, 2013. Because of the amount of evidence that the parties wished to present and other circumstances, the consolidated trial and preliminary injunction hearing was not completed until after a second day of evidence on December 5, 2013. I enter this decision on the merits of Ms. Mendoza's Verified Complaint And Petition For Return Of Children (docket no. 6) following that consolidated trial on the merits and preliminary injunction hearing.

## I.    INTRODUCTION

### A.    Procedural Background

Ms. Mendoza, who was often identified in these proceedings as "Lupita," "Lupe," or "Guadalupe," initiated this action on November 7, 2013, by filing her Application To Proceed *In Forma Pauperis* (docket no. 2), her Motion Under The Hague Convention For Entry Of A Temporary Restraining Order And Scheduling Of An Expedited Hearing (Motion For Temporary Restraining Order) (docket no. 3), and her Motion To File Documents Under Seal (docket no. 4), pertaining to exhibits referred to in her Verified Complaint And Petition For Return Of Children (Verified Complaint) (subsequently filed as docket no. 6). By Order (docket no. 5), filed November 7, 2013, I granted Ms. Mendoza *in forma pauperis* status, directed that her Verified Complaint be filed without prepayment of fees, and directed that exhibits referred to in her Verified Complaint be filed under seal.

### 1. *Ms. Mendoza's verified complaint*

In her Verified Complaint, Ms. Mendoza alleges that Mr. Medina's retention of K.G.M.A. and M.K.M.A. in the United States is wrongful within the meaning of Article 3 of the 1980 Hague Convention, because it is in violation of her rights of custody under Mexican law; that, at the time of the wrongful retention in the United States, she was actually exercising her rights of custody within the meaning of Articles 3 and 5 of the Convention or that, but for Mr. Medina's retention of the children, she would have continued to exercise those rights; and that the children were habitually resident with her in Mexico within the meaning of Article 3 of the Convention just prior to their wrongful retention in the United States. She contends that K.G.M.A. and M.K.M.A. are under the age of 16, so that the Convention applies to them, and that she has filed her Verified Complaint within one year of Mr. Medina's wrongful retention of the children. In her Verified Complaint, Ms. Mendoza sought provisional remedies pursuant to 42 U.S.C. § 11604 and Article 16 of the Convention that are consistent with the remedies sought in her Motion For Temporary Restraining Order; attorney's fees and costs, including transportation costs, pursuant to 42 U.S.C. § 11607; an immediate temporary restraining order; an expedited preliminary injunction hearing, consolidated with a trial on the merits, on why the relief sought in her Verified Complaint should not be granted; a final judgment requiring the return of the children to her custody in Mexico; an order requiring Mr. Medina to pay her expenses and costs; and such further relief as may be just and appropriate under the circumstances.

### 2. *The temporary restraining order*

On November 7, 2013, I granted Ms. Mendoza's Motion For Temporary Restraining Order. Specifically, in a Temporary Restraining Order (docket no. 8), issued *ex parte*, at 2:08 p.m. on November 7, 2013, I enjoined Mr. Medina from removing K.G.M.A. and M.K.M.A. from the jurisdiction of this court pending final

disposition of the Verified Complaint and further order of the court, and I also enjoined him to surrender the minor children's passports and all other travel documents to the Clerk of Court not later than 4:30 p.m. on the third business day after service of the Temporary Restraining Order. In the Temporary Restraining Order, I also set a consolidated trial on the merits and hearing on Ms. Mendoza's request for a preliminary injunction for Monday, November 18, 2013, at which Mr. Medina was directed to show cause why the children should not be returned to Mexico, accompanied by Ms. Mendoza or her designee, and why the other relief requested in the Verified Complaint should not be granted. I also directed Mr. Medina to provide for and ensure the personal appearance at the consolidated trial and preliminary injunction hearing of the minor children K.G.M.A. and M.K.M.A.[1]

The United States Marshals Service personally served Mr. Medina with Ms. Mendoza's Verified Complaint and my Temporary Restraining Order on November 8, 2013. *See* Return of Service (Executed) (docket no. 10). Mr. Medina surrendered the children's passports and travel documents to the Clerk of Court, as directed, shortly before 4:00 p.m. on Wednesday, November 13, 2013.

### 3. *The motion to continue*

Counsel for Mr. Medina attempted to file an Appearance (docket no. 13) and a Motion To Continue (docket no. 14) after regular business hours on November 14,

---

[1] In the Temporary Restraining Order, I also appointed an interpreter for Ms. Mendoza and noted that the interpreter's compensation may be taxed as costs. I also granted Ms. Mendoza's request to appear at the consolidated trial and preliminary injunction hearing via telephone or videoconferencing, if she was unable to obtain a visa in time to attend these proceedings in person. Ms. Mendoza was not able to obtain a visa, so that her appearance at the consolidated trial and preliminary injunction hearing was via videoconference.

2013, but a problem with the electronic filing system prevented those filings, so counsel forwarded courtesy copies to my chambers by e-mail. Ms. Mendoza's counsel encountered the same problem with her attempt to file her Resistance To Defendant's Motion To Continue (docket no. 15) after regular business hours on November 14, 2013, so counsel for Ms. Mendoza also forwarded a courtesy copy of her Resistance to my chambers by e-mail. All three documents were electronically filed on November 15, 2013. By Text Order (docket no. 16), I set telephonic oral arguments on Mr. Medina's Motion To Continue for November 15, 2013.

Mr. Medina's counsel sought a continuance on the ground that she could not adequately prepare for the hearing on November 18, 2013, when she had not been retained and had not had an opportunity to meet with Mr. Medina until November 14, 2013. At the oral arguments, however, Mr. Medina's counsel had difficulty identifying any relevant evidence that she might be prevented from presenting on Mr. Medina's behalf, if the hearing went ahead as scheduled.

Whether to grant or deny a motion to continue is reviewed for abuse of discretion. *See Vasquez v. Colores*, 648 F.3d 648, 652 (8th Cir. 2011). In a case pursuant to the 1980 Hague Convention and ICARA, the district court does not abuse its discretion in denying a motion to continue in light of "the underlying circumstances," including the prejudice that a petitioning parent will suffer from continued delay, and "the professed goal of expediency in Convention proceedings." *Vasquez*, 648 F.3d at 652. Mr. Medina was served with the Verified Complaint and Temporary Restraining Order setting the consolidated trial and preliminary injunction hearing ten days before the hearing date and, although that is a relatively short time, I found that it was not unduly short in light of "the professed goal of expediency in Convention Proceedings." *Id.* On the other hand, I found that there was little risk of flight or evasion of this action for return of the children, where Mr. Medina had

promptly responded to the Temporary Restraining Order by surrendering the children's passports and travel documents to the Clerk of Court, he and the children were living with his parents, he is employed in this District, and the children are attending preschool and school, respectively, in this District. Ms. Mendoza's counsel also represented that mitigation of concerns about evasion of the proceedings reduced the potential prejudice to Ms. Mendoza of a delay of the proceedings, particularly if arrangements could be made for her to have telephone contact with her children while these proceedings were pending. Therefore, while I denied a continuance of the November 18, 2013, consolidated trial and preliminary injunction hearing, I did leave open the possibility that, if Mr. Medina made an adequate offer of proof that there was relevant evidence that he would be able to offer in further proceedings, a second "episode" of the consolidated trial and preliminary injunction hearing would be scheduled for November 26, 2013.

Also, because any concerns that Mr. Medina might flee from the District with the children had been substantially mitigated, and because I found it appropriate to avoid any unnecessary disruption to the children's current routine while this matter is pending, I concluded that Mr. Medina would not be required to provide for the presence of the children at the consolidated trial and preliminary injunction hearing, although I did encourage the parties to work out arrangements for Ms. Mendoza to have telephone contacts with the children. Similarly, where Ms. Mendoza's counsel represented that Ms. Mendoza's designee would not be able to return the children to Mexico immediately, if I ordered such relief, I also excused Ms. Mendoza's designee from attending the consolidated trial and preliminary injunction hearing.

### 4. *The consolidated trial and preliminary injunction hearing*

At the consolidated trial on the merits and preliminary injunction hearing, Ms. Mendoza appeared by videoconference and was represented by Jessica Jo Taylor of

Iowa Legal Aid in Des Moines, Iowa. Mr. Medina appeared personally and was represented by Elizabeth Rosenbaum from Sioux City, Iowa. I was very impressed with both attorneys' ability to marshal the evidence and to make a thorough and effective presentation of that evidence in the limited time frame these expedited proceedings required.

At the first day of the consolidated trial and preliminary injunction hearing on November 18, 2013, Ms. Mendoza reoffered, and I admitted by agreement (or, in the case of Exhibit G, over Mr. Medina's objections), Exhibits A through V attached to Ms. Mendoza's Verified Complaint. She also offered the testimony, via videoconference from Mexico and through an interpreter, of Ms. Mendoza herself; Dr. Juan Jose Garcia Nuche, who testified that he was one of the children's physicians in Mexico; Reyna Colecio Pantoja, the director of the preschool in Mexico attended by one of the children; and Maria del Rosario Pantoja Cantera, the director of the daycare in Mexico attended by the other child.

When it became clear, at the conclusion of the first day of the consolidated trial and preliminary injunction hearing on November 18, 2013, that the parties had more evidence to present, I set a second day of the consolidated trial and preliminary injunction hearing for November 26, 2013. On November 22, 2013, however, with the agreement of the parties, I entered an Order (docket no. 23) resetting the second day of the consolidated trial and preliminary injunction hearing for December 5, 2013, in order to accommodate a personal matter of considerable importance to counsel for one of the parties.

On November 27, 2013, I entered an Order (docket no. 24) regarding possible disposition after the second day of the consolidated trial and preliminary injunction hearing. Specifically, I indicated in that Order that, contrary to my initial indications, I would not rule from the bench, but would file a written ruling within days of the

conclusion of the consolidated trial and preliminary injunction hearing. I also explained that, if I ordered the return of the children to Mexico, as requested by Ms. Mendoza, I would not order their return immediately, but neither would I stay such an order pending appeal. Rather, I would stay any order for return long enough for Mr. Medina to file an appeal and to attempt to obtain a stay pending appeal from the Eighth Circuit Courts of Appeals. I also explained that, even if I decided to grant Ms. Mendoza the requested relief of return of the children to Mexico, I would not order the immediate transfer of the children to the custody of Ms. Mendoza or her designee, nor was it necessary for the children to be personally present at the conclusion of the consolidated trial and preliminary injunction hearing or for Ms. Mendoza or her designee to be personally present to take immediate custody of the children. I indicated that I would continue the injunction on removal of the children from the jurisdiction of the court and retention of their travel documents by the Clerk of Court and would also enjoin Mr. Medina to permit reasonable telephone contact by Ms. Mendoza with the children during the period of any stay or until this court or an appellate court ordered otherwise.

On the second day of the consolidated trial and preliminary injunction hearing on December 5, 2013, Ms. Mendoza presented, again via videoconference from Mexico and through an interpreter, the testimony of her mother, Silvia Aguilar Mendoza. Mr. Medina offered, and I admitted with the agreement of the parties, his Exhibits 1 through 31 (some of which had been amended), and Ms. Mendoza offered, and I admitted, supplemental Exhibits W, X, and Z. Mr. Medina offered the testimony of his mother, Lucina Medina, in person, but through an interpreter, and his own

testimony in English.  Ms. Mendoza then testified in rebuttal, again by videoconference from Mexico and through an interpreter.[2]

## B.    *Initial Findings Of Fact*

In these proceedings, I was not going to determine who was the better parent, the custody of the children, or the best interests of the children, so that the most important evidence here was not necessarily the same as the most important evidence in more common domestic relations litigation.  Rather, as explained in more detail, below, proceedings under the 1980 Hague Convention and the ICARA are "not designed to resolve underlying custody disputes, but rather to ensure that such disputes are adjudicated in the appropriate jurisdiction." *Acosta v. Acosta*, 725 F.3d 868, 875 (8th Cir. 2013) (internal citations omitted).  Consequently, I set forth here only the facts that I find are most relevant to the determination of issues properly before me or necessary to put those issues in context.

### 1.    *The parties' marriage and the births of their children*

I find that the parties were married on September 15, 2006, in Celaya, Guanajuato, Mexico.  At the time, Ms. Mendoza was a Mexican citizen, but Mr. Medina had been living in the United States since he was about five years old, he had been a naturalized United States citizen since September 17, 2004, and he had met Ms. Mendoza while on vacation in Mexico.  Mr. Medina has lived in Storm Lake, Iowa, with his parents, for most of the last 25 years, his father has been employed there that entire time, and Mr. Medina has also been employed there for several years.

---

[2] The interpreters also translated proceedings in English for Ms. Mendoza at both days of the consolidated trial and preliminary injunction hearing.

Ms. Mendoza gave birth to the parties' first child, K.G.M.A., a daughter, in 2007, and their second child, M.K.M.A., also a daughter, in 2009, both in Celaya, Guanajuato, Mexico. The parties have a third daughter, K.V.M.A., who was born in 2011, but who has remained in the custody of Ms. Mendoza in Mexico. The parties' two older children are United States citizens, because their parents obtained a Consular Report of Birth Abroad for each of them from the United States Consulate in Mexico, but the parties did not obtain a Consular Report of Birth Abroad for their youngest child, K.V.M.A., and that child has remained in Mexico at all times. Mr. Medina never attempted to obtain papers for Ms. Mendoza to enter the United States as his wife. Mr. Medina explained that he had not done so, because he thought he should not be hasty about doing so, where he had heard rumors that his wife was a golddigger—notwithstanding that he had three children with her over five years. Ms. Mendoza testified that Mr. Medina had not done so in order to control her and to make it difficult for her to keep or contest custody of the children if they ever visited him in the United States.

### 2.    *Living arrangements and visits to the United States*

After the parties married in 2006, Mr. Medina lived primarily in the United States. More specifically, he would live in the United States for about six months at a time, he would visit Ms. Mendoza and the children in Mexico for about two months, then he would return to the United States alone for another lengthy period. During Mr. Medina's visits to and absences from Mexico, the children consistently lived with Ms. Mendoza in Mexico. During almost the entire time after of the parties' marriage, Ms. Mendoza lived with Ms. Mendoza's mother in her mother's house, although Ms. Mendoza paid rent to her mother. After the parties' children were born, they also lived with Ms. Mendoza and her mother when they were in Mexico. After M.K.M.A. was born, both of the older children attended daycare and preschool in Mexico and

received regular medical care there.  K.G.M.A. was also registered for and assigned to an elementary school in Celaya.

Ms. Mendoza alleged in her Verified Complaint that, until their allegedly wrongful retention in the United States, K.G.M.A. and M.K.M.A. had lived in the familial residence in San Juan de la Vega, Guanajuato, Mexico, and had left Mexico only once, for a pre-arranged visit with their father in the United States in 2011, shortly after the parties' third child was born.  At the consolidated trial and preliminary injunction hearing, however, Ms. Mendoza admitted that she had visited Mr. Medina in Storm Lake, Iowa, from April 2009 through July 2009, with the parties' oldest daughter and while pregnant with their second daughter.  She testified, and Mr. Medina did not dispute, that Mr. Medina arranged for Ms. Mendoza and K.G.M.A. to cross into the United States illegally.  I also find that, in July 2009, Ms. Mendoza told Mr. Medina that she was going for a walk with K.G.M.A., but she actually returned to Mexico without his knowledge.  Ms. Mendoza explained that she had left the United States because she was uncomfortable with Mr. Medina and his mother and had argued with them.

Although K.G.M.A. had visited the United States illegally in 2009, her only other visit to the United States prior to December 2012, and M.K.M.A.'s only visit to the United States prior to December 2012, had been for a pre-arranged visit with their father in the United States in 2011, shortly after the parties' third child was born. Ms. Mendoza alleges that, on that occasion, although the parties had agreed that K.G.M.A. and M.K.M.A. would only stay with Mr. Medina for two months, Mr. Medina kept the children in the United States, over Ms. Mendoza's objections, for eleven months.  Mr. Medina disputes that he kept the children longer than the parties had agreed.

### 3.    *Separation of the parties*

The parties separated permanently in July 2012.  Ms. Mendoza testified that the separation came after Mr. Medina assaulted her.  Ms. Mendoza and her mother, with whom Ms. Mendoza and the children were still living, told Mr. Medina that he had to leave because of the domestic abuse.  Indeed, Ms. Mendoza testified that, prior to their separation, Mr. Medina assaulted her on a regular basis.  Mr. Medina did not dispute the separation, but asserted that Ms. Mendoza's definition of "assault" was simply raising his voice.  On August 22, 2012, Ms. Mendoza's mother reported to the Office of the Public Prosecutor of Guanajuato that Mr. Medina had assaulted her.  *See* Verified Complaint, Exhibit Q (identifying Silvia Aguilar Mendoza as the "injured party," and the date as August 22, 2012, notwithstanding that the Verified Complaint, ¶ 14, suggests that the report by the mother was in July 2012).  Mr. Medina left the familial home in July 2012, but initially stayed in Mexico, prior to returning to the United States in September 2012.

There is no divorce decree or separation decree in the record, nor is there any written or judicially endorsed child custody agreement or decree.  Rather, the only divorce proceeding initiated by either party was one filed by Mr. Medina in the Iowa District Court for Buena Vista County.  Mr. Medina's Petition For Dissolution Of Marriage was filed on November 15, 2013, notwithstanding that Mr. Medina's counsel had sought a continuance of the November 18, 2013, consolidated trial and preliminary injunction hearing in this matter, based on her representation that she did not have enough time to prepare for the consolidated trial and preliminary injunction hearing.  Mr. Medina's counsel admitted at the first day of the consolidated trial and preliminary injunction hearing that she had "felt that it was important to have another piece of evidence to show that it was [her] client's position that Iowa was the home state and

thus establishing jurisdiction in Buena Vista County." Real Time Transcript from November 18, 2013, at 9:03 a.m.

### 4. *The allegedly wrongful retention of the children*

The factual matters that are really the crux of this case relate to Mr. Medina's allegedly wrongful retention of K.G.M.A. and M.K.M.A. in the United States after they came here to visit him in December 2012. Mr. Medina asserted that Ms. Mendoza had contacted him and demanded that he take the children, because she no longer loved them or wished to care for them. The only circumstantial evidence that Mr. Medina offered in support of this position were some text messages that the parties do not dispute that Ms. Mendoza sent to Mr. Medina on May 12, 2012, although the parties do dispute both the significance and the translation of these text messages. These text messages are shown below, with Mr. Medina's own translation, as offered in his Exhibit 13, on the left, and a translation for Ms. Mendoza, as offered in her Exhibit X, on the right:

| Date/Time | Sender | Translation by Mr. Medina | Translation for Ms. Mendoza |
|-----------|--------|---------------------------|------------------------------|
| 5/12/12, 11:48 a.m. | Ms. Mendoza: | "Did you call me?" | "Did you call me?" |
| 5/12/12, 3:00 p.m. | Ms. Mendoza: | "I don't love your daughters you can come get them whenever you want here they are I am fed up with them and sick of them." | "I don't want your girls when you want to come and get them here they are I am fed up with this shit and I am tired." |
| 5/12/12, 9:36 p.m. | Ms. Mendoza: | "Hey love I am going inside in 20 min" | "Hey love I am going inside in 20 . . . ." [cuts off] |

Mr. Medina testified that he and Ms. Mendoza thereafter arranged for the two older girls to come to the United States permanently, beginning in December 2012. In contrast, Ms. Mendoza describes the text messages as a momentary venting of frustration, but that she never agreed nor wanted the children to go to the United States permanently. I do not find that these text messages, by themselves, constitute consent

by Ms. Mendoza to a permanent transfer of the two older children to the United States, nor is there sufficient other evidence for me to conclude that Ms. Mendoza ever consented to the permanent transfer of the children to Mr. Medina's custody in the United States.

What I do find is that the parties agreed that K.G.M.A. and M.K.M.A. would visit Mr. Mendoza, starting in December 2012. The parties arranged to meet at the border in Neuvo Laredo, Mexico, on December 18, 2012, and Mr. Medina sent Ms. Mendoza money for bus fare for her and the two older children to make the approximately twelve-hour bus trip to the border. Prior to the children's visit, Ms. Mendoza arranged for their absences of approximately six weeks from daycare and preschool, respectively, which I find demonstrates Ms. Mendoza's intent and understanding that the children were going for a visit of six weeks to two months, not for a permanent transfer.

The parties vehemently dispute precisely what happened at the border on December 18, 2012, and in the two days following. Ms. Mendoza contends that, when Mr. Medina and his mother, Lucina Medina, arrived, they told Ms. Mendoza that Mr. Medina planned to keep the children for at least six months, instead of returning the children in six or eight weeks, as previously agreed, and that Ms. Mendoza objected. Mr. Medina and his mother testified that there had been no prior agreement for a short visit by the children; rather, the agreement was for the permanent transfer of the two older children to the United States. They testified that Ms. Mendoza suddenly reiterated her prior demands that Mr. Medina again take her across the border illegally, as well as the children, this time so that Ms. Mendoza could go to Texas to be with a man with whom she had struck up a relationship over the internet.

There is no dispute that a physical altercation between Ms. Mendoza and Mrs. Medina occurred on December 18, 2013. The parties do not dispute that Mexican

federal police intervened and that Ms. Mendoza was detained overnight by the Second Agency of the Public Ministry of Family Protection for assaulting Mr. Medina's mother. Ms. Mendoza later filed a formal complaint against Mr. Medina with the Attorney General of the State of Tamaulipas, where the altercation occurred. *See* Verified Complaint, Exhibit R.

The parties agree that, with the assistance of Mexican government officials and/or the police, they reached an agreement to resolve the dispute at the border, but their versions of that agreement differ very substantially. Ms. Mendoza submitted, as her Exhibit S, a Spanish transcript and an English translation of a mediation meeting before an Agent of the Public Ministry, as a third-party conciliator, of the dispute between Ms. Mendoza and Mr. Medina and his mother. Ms. Mendoza contends, and the English translation of the mediation transcript reflects, that the parties agreed that Mr. Medina would return the children at 7:00 p.m. on February 2, 2013, at the bus station in Nuevo Laredo, and that both parties requested a certified copy of the hearing transcript at the conclusion of the mediation. *See* Plaintiff's Exhibit S. The Spanish transcript of the mediation purports to bear the signatures of Lucina Medina, Ms. Mendoza, and Mr. Medina, or two or more of them, in the margin of each page. *Id.* Ms. Mendoza testified that the transcript reflects her understanding of the parties' agreement.

Mr. Medina and his mother both testified, however, that the only agreement reached with anyone was that Lucina Medina would drop the charges against Ms. Mendoza arising from the altercation on December 18, 2012, and that Mr. Medina and his mother would be allowed to take K.G.M.A. and M.K.M.A. to the United States permanently, as previously agreed. Lucina Medina testified that what purports to be her signature on Exhibit S is "the way [she] writes it." Real Time Transcript, December 5, 2013, at 9:57 a.m. She also testified, however, that she does not read or

write much Spanish or English, and that trying to read something as long as Exhibit S would have given her a headache. She testified that, to the extent that anyone explained any agreement to her, she understood that it was for her to drop the charges against Ms. Mendoza and for her and Mr. Medina to take the children to the United States.

Mr. Medina admitted that what purports to be his mother's signature on Exhibit S is, in fact, his mother's signature, but denied that what purports to be his signature is, in fact, his signature. He also denied that there was ever any agreement for the return of the children on February 2, 2013. He also testified that he was not a party to any agreement and that the only agreement at the border was between his mother and Ms. Mendoza to drop the charges against Ms. Mendoza, so that she would not have to spend any time in prison and so that he and his mother could take the children to the United States. Mr. Medina also denied ever having read either Exhibit S or the English translation of it prior to reading it while in the witness box on the second day of the consolidated trial and preliminary injunction hearing on December 5, 2012, notwithstanding that it was an exhibit that was served on him with Ms. Mendoza's Verified Complaint. When asked for an explanation of where Exhibit S came from, Mr. Medina testified that he believed that Mexico is so corrupt that anything could be obtained for the right amount of money. He and his mother also asserted that the present proceedings are motivated by Ms. Mendoza's desire for revenge for his refusal to get Ms. Mendoza "papers" to enter the United States, or to help her enter the United States illegally, so that she could join a man with whom she had a relationship over the internet in Texas.

Notwithstanding the terms of the purported mediation agreement in Exhibit S, Ms. Mendoza testified that when she called Mr. Medina to talk to the children in the United States in January 2013, Mr. Medina told her that she should not bother showing up to pick up the children on February 2, 2013. Ms. Mendoza objected and told

Mr. Medina that she expected him to return the children as agreed. That telephone conversation was the last contact that Ms. Mendoza had with Mr. Medina or her two oldest children until these proceedings were initiated. On February 2, 2013, Ms. Mendoza arrived at the bus station in Nuevo Laredo and waited until 7:00 p.m., the time that the parties had agreed that the children would be returned, but Mr. Medina did not arrive with the children.

### 5. *Circumstances after February 2, 2013*

Mr. Medina also argues that, after he retained the children in the United States, Ms. Mendoza acquiesced in his doing so. I do so find.

Specifically, Ms. Mendoza testified that, after her last call to Mr. Medina in January 2013, he changed his telephone number and his address, because she was unable to contact him or the children by telephone, and that she did not have any means of contacting or locating the children, Mr. Medina, or Mr. Medina's family. She contended that her attempts to contact Mr. Medina or the children by telephone, e-mail, or "facebook" had been ignored by Mr. Medina. Mr. Medina admitted that he and his parents had obtained a new telephone number in January 2013, which he had never provided to Ms. Mendoza, and that he and his parents (with his children) moved to a new address in Storm Lake, Iowa, in August 2013, which he admitted that he also had never provided to Ms. Mendoza. He testified that he did not take any steps to convey his new contact information to Ms. Mendoza, because he believed that she wanted nothing to do with her children and that such conduct in a mother was unacceptable. He also asserted that Ms. Mendoza could have found a way to contact him, including by e-mail, if she had wanted to, because his father continued to be employed at the same place in Storm Lake where he had been employed for 25 years, and Mr. Medina himself continued to be employed at the same business in Storm Lake. He also testified that Ms. Mendoza had had several telephone numbers and e-mail addresses before and

after the children came to him in the United States in December 2012, and that he did not know which numbers or e-mail addresses were currently working. He admitted that he had never tried to e-mail Ms. Mendoza after January 2013. He also suggested that any e-mails that Ms. Mendoza might have sent him might have been filtered out as "junk" by his e-mail service provider.

Ms. Mendoza testified that she had not received any calls from Mr. Mendoza after the last call in January 2013. Mr. Medina testified that he had called Ms. Mendoza's home phone number two or three times in January 2013, but had not left a message, because Mexican telephones have caller ID, just like United States telephones. He admitted that he had not tried to call her home telephone numbers since January 2013. Although Mr. Medina testified that he thought that Ms. Mendoza could contact him by e-mail, he then testified that he rarely checked his e-mail. Mr. Medina also initially denied that he had a "facebook" page. When pressed by Ms. Mendoza's counsel, however, Mr. Medina admitted that he had had a "facebook" account, but had taken it down after only a few months, because it didn't interest him. He explained that he thought of "facebook" only as "entertainment," and that he was not sure if he had deleted the account before or after these proceedings were initiated. When confronted with Ms. Mendoza's counsel's assertions that she had downloaded images from his "facebook" page in November of this year, after these proceedings had been initiated, Mr. Medina admitted that he might not have deleted his "facebook" account until after these proceedings were initiated, and he later volunteered that he had deleted that account on the advice of counsel, notwithstanding that his counsel had objected to a question about whether counsel had advised him to delete the page on the grounds of attorney-client privilege. Mr. Medina also admitted that he had not attempted to arrange telephone or other contacts between his two daughters in the United States and their younger sister, who is still in Mexico.

On March 6, 2013, Ms. Mendoza submitted a Request For Return Of Children to the United States Department of State through the Mexican Central Authority, to which she attached the mediation transcript from December 2012. *See* Verified Complaint, Exhibit T. She also attempted to obtain the assistance of a Mexican lawyer to obtain the return of her children, but none agreed to assist her, and she was ultimately directed by the United States State Department to Iowa Legal Aid for legal assistance with this matter.

## II. LEGAL ANALYSIS, INCLUDING SOME ADDITIONAL FINDINGS OF FACT

### A. Overview Of The Convention And The ICARA

The goal of the 1980 Hague Convention on the Civil Aspects of Child Abduction is "'to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access.'" *Vasquez v. Colores*, 648 F.3d 648, 650 (8th Cir. 2011) (quoting *Nunez–Escudero v. Tice–Menley*, 58 F.3d 374, 375 (8th Cir. 1995), in turn quoting the Convention, Preamble). The Convention "accomplishes this goal not by establishing any substantive law of custody, but rather by acting as a forum selection mechanism, operating on 'the principle that the child's country of "habitual residence" is "best placed to decide upon questions of custody and access."'" *Barzilay v. Barzilay*, 600 F.3d 912, 916 (8th Cir. 2010) (*Barzilay II*) (quoting *Villegas Duran v. Arribada Beaumont*, 534 F.3d 142, 146 (2d Cir. 2008), in turn quoting Elisa Pérez-Vera, Explanatory Report, *in* 3 Hague Conference on Private Int'l Law, Acts and Documents of the Fourteenth Session, Child Abduction 426, 434-35 (1982)). As the United States Supreme Court recently explained, "The [1980] Hague Convention . . . generally requires courts in the United

States to order children returned to their countries of habitual residence, if the courts find that the children have been wrongfully removed to or retained in the United States." *Chafin v. Chafin*, ___ U.S. ___, ___, 133 S. Ct. 1017, 1021 (2013); *Acosta v. Acosta*, 725 F.3d 868, 875 (8th Cir. 2013). The United States ratified the treaty and passed implementing legislation, known as the International Child Abduction Remedies Act (ICARA), 42 U.S.C. §§ 11601-11610, in 1988. *Id.*

The Convention and the implementing legislation, however, are "not designed to resolve underlying custody disputes, but rather to ensure that such disputes are adjudicated in the appropriate jurisdiction." *Acosta*, 725 F.3d at 875 (internal citations omitted). Thus, the Convention's "'primary purpose is to restore the status quo and deter parents from crossing international borders in search of a more sympathetic court." *Id.* (quoting *Nunez–Escudero v. Tice–Menley*, 58 F.3d 374, 376 (8th Cir. 1995)); *Barzilay II*, 600 F.3d at 916-17 ("The purpose of proceedings under the Hague Convention is thus not to establish or enforce custody rights, but only 'to "provide for a reasoned determination of where jurisdiction over a custody dispute is properly placed."'" (quoting *Barzilay v. Barzilay*, 536 F.3d 844, 85 (8th Cir. 2008) (*Barzilay I*), in turn quoting *Yang v. Tsui*, 416 F.3d 199, 203 (3d Cir. 2005))).[3]

---

[3] In *Chafin*, the United States Supreme Court explained the terms of the Convention and the implementing act in somewhat more detail, as follows:

> The Convention seeks "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Art. 1, S. Treaty Doc. No. 99–11, at 7. Article 3 of the Convention provides that the "removal or the retention of a

(Footnote continued . . .

child is to be considered wrongful" when "it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention" and "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Ibid.*

Article 12 then states:

"Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith." *Id.*, at 9.

. . . [T]he Convention directs Contracting States to "designate a Central Authority to discharge the duties which are imposed by the Convention." Art. 6, *id.*, at 8; *see also* Art. 7, *ibid.*

Congress established procedures for implementing the Convention in ICARA. *See* 42 U.S.C. § 11601(b)(1). The Act grants federal and state courts concurrent jurisdiction over actions arising under the Convention, § 11603(a), and directs them to "decide the case in accordance with the Convention," § 11603(d). If those courts find children to have been wrongfully removed or retained, the children "are to be promptly returned." § 11601(a)(4). ICARA also provides that courts ordering children returned generally must require defendants to pay various expenses incurred by plaintiffs, including court costs, legal fees, and transportation costs associated with the return of the

(Footnote continued . . .

## 1.	The requesting party's burden

As the Eighth Circuit Court of Appeals has explained, "'The key inquiry under the Convention is whether a child has been wrongfully removed from the country of its habitual residence or wrongfully retained in a country other than that of its habitual residence.'" *Barzilay II*, 600 F.3d at 917 (quoting *Barzilay [I]*, 536 F.3d at 847). Consequently, the implementing legislation (ICARA) provides, in pertinent part, as follows:

> **(e)** Burdens of proof
>
>> **(1)** A petitioner in an action brought under subsection (b) of this section shall establish by a preponderance of the evidence—
>>
>>> **(A)** in the case of an action for the return of a child, that the child has been wrongfully removed or retained within the meaning of the Convention; and
>>>
>>> **(B)** in the case of an action for arrangements for organizing or securing the effective exercise of rights of access, that the petitioner has such rights.

42 U.S.C. § 11603(e)(1).

---

> children. § 11607(b)(3). ICARA instructs the President to designate the U.S. Central Authority, § 11606(a), and the President has designated the Office of Children's Issues in the State Department's Bureau of Consular Affairs, 22 CFR § 94.2 (2012).

*Chafin*, ___ U.S. at ___, 133 S. Ct. at 1021-22.

It appears that Ms. Mendoza's action falls within § 11603(e)(1)(A) as "an action for the return of a child" based on "wrongful retention." On a claim of wrongful removal or retention,

> in order to determine whether an ICARA petition merits relief, "a court must … [(1)] determine when the removal or retention took place, [(2)] what the habitual residence of the child was immediately prior to the removal, [(3)] whether the removal or retention violated the petitioner's custody rights under the law of [the] habitual residence, and [(4)] whether the petitioner was exercising those rights at the time of the removal [or retention]." *Barzilay [I]*, 536 F.3d at 847 (citing *Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001)). "Once it is determined that a child who was habitually residing in a contracting state was wrongfully removed to or retained in another, the Convention requires that the country in which the child is located 'order the return of the child forthwith.'" *Id.* (quoting Hague Convention art. 12).

*Barzilay II*, 600 F.3d at 917.

## 2. *The resisting party's affirmative defenses*

If the petitioning parent establishes the elements set out above, the responding parent may assert one or more of the "narrow exception[s]" to the Convention's "general rule of return." *Acosta*, 725 F.3d at 875. As the United States Supreme Court has explained,

> Return is not required if the parent seeking it was not exercising custody rights at the time of removal or had consented to removal, if there is a "grave risk" that return will result in harm, if the child is mature and objects to return, or if return would conflict with fundamental principles of freedom and human rights in the state from which return is requested. Arts. 13, 20, *id.*, at 10, 11.

*Chafin*, ___ U.S. at ___, 133 S. Ct. at 1021.  The Eighth Circuit Court of Appeals has expressly identified the exceptions in Articles 12, 13, and 20 of the Convention, referenced in 42 U.S.C. § 11603(e)(2) of ICARA, as "affirmative defenses to return." *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir. 1995).

More specifically, as to burdens of proof on the responding party, ICARA provides as follows:

> **(e)** Burdens of proof
>
> * * *
>
>> **(2)** In the case of an action for the return of a child, a respondent who opposes the return of the child has the burden of establishing—
>>
>>> **(A)** by clear and convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies; and
>>>
>>> **(B)** by a preponderance of the evidence that any other exception set forth in article 12 or 13 of the Convention applies.

42 U.S.C. § 11603(e)(2).

Thus, a respondent may retain the children, if he or she proves, by clear and convincing evidence, that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," Convention, art. 13b; *Acosta*, 725 F.3d at 875; or that the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms," *id*. at art. 20.  A respondent may also retain the children, if he or she proves, by a preponderance of the evidence, that "proceedings have been commenced after the expiration of the period of one year [from the date of the wrongful removal or retention] [and] it is demonstrated that the child is now settled in its new environment," *id*. at art. 12; that

"the person . . . having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention," *id*. at art. 13a; "that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views," *id*. at art 13 (unnumbered penultimate paragraph); or that "information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence" demonstrates that return is not appropriate, *id*. at art. 13 (unnumbered final paragraph).

### B.     Ms. Mendoza's Case

As indicated above, to obtain relief on her Verified Complaint alleging that Mr. Medina wrongfully retained K.G.M.A. and M.K.M.A. in the United States, Ms. Mendoza must prove the following:  (1) the date that the retention took place; (2) that Mexico was the habitual residence of the child immediately prior to the retention; (3) that the retention violated her custody rights under the law of the habitual residence; and (4) that she was exercising those custody rights at the time of the retention. *Barzilay II*, 600 F.3d at 917.  I turn now to consideration of Ms. Mendoza's proof on these elements.

### 1.     The date of the retention

The first two elements are interrelated, because "[t]he first step in determining a child's habitual residence is to discern when the alleged wrongful removal or retention took place, for 'the text of the Convention directs courts to only one point in time in determining habitual residence:  the point in time "immediately before the removal or retention."'" *Barzilay II*, 600 F.3d at 918 (quoting *Silverman v. Silverman*, 338 F.3d 886, 897 (8th Cir. 2003) (en banc), in turn quoting the 1980 Hague Convention, art. 3).  Here, K.G.M.A. and M.K.M.A. were "removed" from Mexico to the United

States in December 2012, but I find that the date that is significant here is not the date of their "removal" to the United States, but the date of their "retention" in the United States. This is so, because the parties initially agreed that K.G.M.A. and M.K.M.A. could visit Mr. Medina in the United States. On the other hand, I find that Mr. Medina "retained" K.G.M.A. and M.K.M.A. in the United States when he did not return them to Mexico on February 2, 2013, as the parties had agreed. In arriving at this conclusion, I have necessarily rejected the testimony of Mr. Medina and credited the testimony of Ms. Mendoza, and I have necessarily accepted the authenticity of Exhibit S, the transcript of the conciliation at the United States/Mexico border on December 18, 2012. I find that Exhibit S confirms Ms. Mendoza's testimony that the parties had an agreement for the return of the children to Mexico after a temporary stay in the United States and undermines Mr. Medina's testimony that the parties had an agreement for a permanent transfer of the children to his custody in the United States. Thus, the date of the "retention" here is February 2, 2013, when Ms. Mendoza was to meet the children at the United States/Mexico border, but they did not appear as Ms. Mendoza and Mr. Medina had agreed at the time of the children's "removal" to the United States.

### 2. The children's "habitual residence"

The second element, proof of the "habitual residence" of the child under the 1980 Hague Convention, "raises mixed questions of law and fact," which the appellate court reviews *de novo*, albeit deferring to the district court's underlying factual findings, unless they are clearly erroneous. *Barzilay II*, 600 F.3d at 916. Unfortunately, "[h]abitual residence was not defined in the Hague Convention, and subsequent courts have had some difficulty in interpreting this term." *Sorenson v. Sorenson*, 559 F.3d 871, 873 (8th Cir. 2009).

The Eighth Circuit Court of Appeals has provided the following guidance, however:

> A person may have only one habitual residence, and it should not be confused with domicile. [T]he court must focus on the child, not the parents, and examine past experience, not future intentions. Habitual residence may only be altered by a change in geography and passage of time.
>
> Federal courts are agreed that "habitual residence" must encompass some form of "settled purpose." The settled purpose need not be to stay in a new location forever, but the family must have a "sufficient degree of continuity to be properly described as settled." Additionally, the settled purpose must be from the child's perspective, although parental intent is also taken into account.

*Silverman*, 338 F.3d at 898 (citations omitted); *see also Sorenson*, 559 F.3d at 873 (quoting *Silverman*, 338 F.3d at 898). Thus, various factors are relevant to the determination of habitual residence: "the settled purpose of the move to the new country from the child's perspective, parental intent regarding the move, the change in geography, the passage of time, and the acclimatization of the child to the new country." *Barzilay II*, 600 F.3d at 918 (internal quotation marks and citations omitted).[4]

---

[4] A somewhat more complete statement of the pertinent factors that district courts should consider, from *Silverman*, is the following:

> The court should have looked at the habitual residence of the Silverman children at the time Julie removed them from Israel, keeping in mind that they could only have one habitual residence. The court should have determined the degree of settled purpose from the children's

(Footnote continued . . .

The Eighth Circuit Court of Appeals has upheld a determination that the country where the children had lived for their whole lives or for a number of years immediately before their removal or retention and where the children had attended school was the children's "habitual residence," where there is no indication that the children had spent any significant time in another country and the intent of the parents to stay in that country or another country was uncertain or differed between the parents. *Id*. at 918. Similarly, here, prior to their retention in the United States, K.G.M.A. and M.K.M.A. had lived almost their entire lives in Mexico, with only one stay out of that country for both M.K.M.A. and K.G.M.A.—a stay in the United States with Mr. Medina for eleven months, which was longer than the two months that the parties had agreed that visit would last—and a prior, illegal stay of four months in the United States by K.G.M.A. *Cf. id*. This case may differ from *Barzilay II* because of these stays outside of the asserted country of "habitual residence." Nevertheless, it was clear that, even at the time of these visits, from the perspective of the children and the parents, K.G.M.A.'s first stay was a temporary, illegal visit, and the longer stay by both children in the United States was also temporary—although Mr. Medina kept the

---

perspective, including the family's change in geography along with their personal possessions and pets, the passage of time, the family abandoning its prior residence and selling the house, the application for and securing of benefits only available to [the new country's] immigrants, the children's enrollment in school, and, to some degree, both parents' intentions at the time of the move to [the new country].

*Silverman*, 338 F.3d at 898-99 (footnote omitted). Some of these factors are more pertinent in a case like *Silverman*, in which the entire family had moved to a new country, but one parent attempted to move the children back to the former country of residence or to another country.

children longer than the parties had agreed. In both instances, the children ultimately returned to Mexico for an extended period of time and, from their perspective, those returns were to their habitual residence.

Furthermore, the children had attended daycare and preschool in Mexico, and the older child was enrolled in an elementary school in Mexico. *Id.* Even if the children have acquired personal possessions in the United States, there is no indication that they abandoned all of their personal belongings or the familial residence in Mexico, and it is clear that Ms. Mendoza intended that the children would continue to reside in Mexico after their second visit to the United States, for example, from her actions in obtaining permission to take the children out of daycare and preschool for only six weeks to two months to accommodate their visit to the United States beginning in December of 2012. *Silverman*, 338 F.3d at 898-99. Although Mr. Medina points out that the children have been enrolled in daycare and/or school in the United States, and are doing well there, that enrollment was *after* the date that they were "retained" in the United States, so that it does not alter the conclusion that Mexico is the children's "habitual residence." *Barzilay II*, 600 F.3d at 918 (explaining that "the text of the Convention directs courts to only one point in time in determining habitual residence: the point in time immediately before the removal or retention" (internal quotation marks and citations omitted)).

A determination of "habitual residence" based on the factors identified in *Barzilay II* is not overturned by consent judgments or agreements, either on the basis of *res judicata* or contracts. First, "'federal courts adjudicating Hague Convention petitions must accord full faith and credit only to the judgments of those state or federal courts that actually adjudicated a Hague Convention claim in accordance with the dictates of the Convention.'" *Id*. at 920 (quoting *Holder v. Holder*, 305 F.3d 854, 864 (9th Cir. 2002), in turn citing 42 U.S.C. § 11603(g)). Second, contractual agreements

concerning "habitual residence" are not determinative, because "determination of habitual residence under the Hague Convention is a fact intensive inquiry particularly sensitive to the perspective and circumstances of the child," and parental stipulations would render those factual considerations irrelevant and would be at odds with the basic principles of the Convention, which reject "artificial jurisdictional links" as a means to remove a child from the environment in which its life has developed. *Id*.

Thus, Mr. Medina's attempt to establish that the parties had an agreement for the permanent transfer of the children to the United States in December 2012, which he asserts was reached after Ms. Mendoza's text messages in May 2012 and in subsequent conversations—even if I found his testimony credible on this point, which I do not—would not establish that the United States was the children's "habitual residence." By the same token, it is not enough for Ms. Mendoza to point to the parties' agreement in the mediation at the United States/Mexico border in December 2012 concerning the length of the children's stay with Mr. Medina in the United States to establish that Mexico was the children's "habitual residence" prior to their retention in the United States. Also, the *lack* of any specific custody decree or agreement in Mexican divorce or separation proceedings placing the children in Ms. Mendoza's custody after the parties separated does not weigh against a determination that, from the children's perspective, Mexico was the children's "habitual residence" prior to their retention in the United States.

Mr. Medina argued that the United States is the children's "habitual residence" because the amount of time that the children have spent here is a substantial part of their lives. Mr. Medina clearly cannot rely on the length of the children's stay in the United States *after* their allegedly wrongful retention on February 2, 2013, as establishing that the United States is their "habitual residence." *See Barzilay II*, 600 F.3d at 918 ("[T]he text of the Convention directs courts to only one point in time in

determining habitual residence: the point in time immediately before the removal or retention." (internal quotation marks and citations omitted)). While both children had undeniably spent a significant part of their young lives in the United States, even before February 2, 2013, I found, above, that both of K.G.M.A.'s prior stays and M.K.M.A.'s only prior stay in the United States were intended by the parties to be temporary and, from the children's perspective, their return to Mexico after those visits was a return to their habitual residence. Also, because I have found that Mr. Medina kept the children longer than the parties had agreed during their 2011 visit, I think that the length of that visit must be discounted (though not entirely disregarded) as an indication of the children's "habitual residence." *See id.* (considering that the intent of the parents to stay in one country or another country was uncertain or differed between the parents).

I find that Mexico was the children's "habitual residence" prior to their allegedly wrongful retention in the United States on February 2, 2013.

### 3. *"Wrongful" retention*

The third and fourth elements that Ms. Mendoza must prove are that the retention of the children violated her custody rights under the law of the habitual residence, which I have determined is Mexico, and that she was exercising those rights at the time of the retention. *Barzilay II*, 600 F.3d at 917. In other words, she must prove that the retention of the children was "wrongful." To put it another way,

> The key inquiry under the Convention is whether a child has been wrongfully removed from the country of its habitual residence or wrongfully retained in a country other than that of its habitual residence.

*Barzilay I*, 536 F.3d at 847.

"A retention or removal is wrongful only if it meets the requirements of Article 3 of the Convention." *Id.* More specifically,

According to the Convention,

> The removal or the retention of a child is to be considered wrongful where:
>
>> (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>>
>> (b) At the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> Hague Convention art. 3.

*Barzilay II*, 600 F.3d at 917. Pertinent regulations clarify the meaning of "wrongful retention" as follows:

> "Wrongful retention" refers to the act of keeping the child without the consent of the person who was actually exercising custody. *The archetype of this conduct is the refusal by the noncustodial parent to return a child at the end of an authorized visitation period.*

51 Fed.Reg. 10494 (emphasis added); *see also Silverman*, 338 F.3d at 898 (quoting this regulation).

Here, Ms. Mendoza points out that Article 468 of the Civil Code of the State of Guanajuanto, Mexico, states, in pertinent part, "Parental authority/responsibility (*patria potestas*) over the children of a married couple is to be exerted jointly by the mother and father." *See* Verified Complaint, Exhibit U. She argues that Mr. Medina's retention of the children in the United States violated her "*patria potestas*" rights under Mexican law, because the exercise of such rights by both parents requires that both must consent to removal of a child to another country. She points out that the First

Circuit Court of Appeals recognized that a similar provision of the law of the State of Baja California Sur established the rights of both parents to exercise authority over the place where a child resides. *See Whallon v. Lynn*, 230 F.3d 450, 457-58 (1st Cir. 2000). She also points to Article 5 of the Convention, which states that rights of custody "shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." 1980 Hague Convention, art. 5(a). I conclude that Mexican law afforded Ms. Mendoza a custody right to determine where K.G.M.A. and M.K.M.A. reside at the time that the children were "retained" by Mr. Medina in the United States.

The next question is whether Ms. Mendoza was exercising that custody right "[a]t the time of . . . retention" or that her right "would have been so exercised but for the . . . retention." 1980 Hague Convention, art. 5(b); *Barzilay II*, 600 F.3d at 917. Ms. Mendoza had been actually exercising her custodial rights over K.G.M.A. and M.K.M.A. up until the time that they went to visit Mr. Medina in the United States in December 2012; she disputed Mr. Medina's attempt at a unilateral change in the length of the children's stay in the United States before the children were removed from Mexico, and she obtained a mediated agreement for return of the children to Mexico on February 2, 2013; she was at the United States/Mexico border at the designated time for the children to be returned; and, but for Mr. Medina's failure to return the children, she would again be exercising parental rights as the person actually in sole custody of the children. Indeed, this case presents the "archetypical" case of "wrongful retention," because it involves "refusal by the noncustodial parent [Mr. Medina] to return a child at the end of an authorized visitation period." 51 Fed.Reg. 10494 (emphasis added); *see also Silverman*, 338 F.3d at 898 (quoting this regulation as defining "wrongful retention").

I find that retention of K.G.M.A. and M.K.M.A. by Mr. Medina in the United States was in violation of Ms. Mendoza's custody rights under Mexican law and that she would have been exercising those custody rights over the children at the time of their retention in the United States but for Mr. Medina's retention of the children. Consequently, I find that Mr. Medina's retention of the children was "wrongful."

### 4. Summary

Because I find that that both K.G.M.A. and M.K.M.A., who were habitually residing in Mexico, were wrongfully retained in the United States by Mr. Medina, the Convention requires that the United States, the country in which the children are now located, "order the return of the child forthwith," *see* 1980 Hague Convention, art. 12; *Barzilay II*, 600 F.3d at 917, *unless* Mr. Medina has proved one of the affirmative defenses to return of the children. *See Chafin*, ___ U.S. at ___, 133 S. Ct. at 1021; *Acosta*, 725 F.3d at 875.

## C. Mr. Medina's Affirmative Defenses

Again, to overcome application of the "rule of return," Mr. Medina must prove one or more "affirmative defenses" defined in Articles 12, 13, and 20 of the Convention, according to the burdens of proof established in 42 U.S.C. § 11603(e)(2). *See Chafin*, ___ U.S. at ___, 133 S. Ct. at 1021; *Acosta*, 725 F.3d at 875; *see also Rydder*, 49 F.3d at 372 (expressly identifying the exceptions in Articles 12, 13, and 20 of the Convention, and referenced in 42 U.S.C. § 11603(e)(2) of ICARA, as "affirmative defenses to return"). Therefore, I will consider the affirmative defenses that he has raised here.

*1.* *Various affirmative defenses under Articles 12, 13a and unnumbered paragraphs, and 20*

Most of the affirmative defenses set out in the Convention are inapplicable or simply not colorable here. Mr. Medina's counsel suggested that the "acclimatization" of the children to the United States is an available affirmative defense here, or at least is a factor in the "habitual residence" analysis. *See Barzilay II*, 600 F.3d at 918 (considering "the acclimatization of the child to the new country" as a factor in the "habitual residence" analysis). I concluded, above, that the children were not "acclimated" to the United States during their visits to the United States prior to their wrongful retention on February 2, 2013, because, from their perspective, those visits were temporary, and their return to Mexico after those visits was a return to their "habitual residence." Mr. Medina cannot rely on the "affirmative defense" that the children are now "settled" in the United States, because these proceedings were commenced less than a year from the date of wrongful retention, which makes an affirmative defense "that the child is now settled in its new environment" unavailable. *See* 1980 Hague Convention at art. 12 (defining an affirmative defense where "proceedings have been commenced *after the expiration of the period of one year* [from the date of the wrongful removal or retention] [and] it is demonstrated that the child is now settled in its new environment" (emphasis added)).

Similarly, I also cannot decide this case based on a defense that the children might prefer to stay in the United States—where Mr. Medina asserts that the children do not want to return to Mexico—because the children—four and five years old, respectively—however precocious they might be, are not of "an age and degree of maturity at which it is appropriate to take account of [their] views." *See id.* at art 13 (unnumbered penultimate paragraph). Mr. Medina specifically argued that Ms. Mendoza was "not actually exercising the custody rights at the time of . . .

retention." *See id.* at art. 13a. Specifically, he testified that he believed that Ms. Mendoza paid other people to take care of the children and to take them to or from preschool and daycare. He has failed to prove this affirmative defense by the applicable "preponderance of the evidence" standard, *see* 42 U.S.C. § 11603(e)(2) (the defenses under Article 13a of the 1980 Hague Convention must be proved "by the preponderance of the evidence"). The record shows that Ms. Mendoza was the primary person exercising custody rights during the parties' marriage and after their separation, while Mr. Medina spent long periods in the United States out of contact with his children. Also, Mr. Medina has failed to convince me, by the preponderance of the evidence, that Ms. Mendoza's reliance on others to provide child care or to transport the children to and from daycare or preschool is any different from the conduct of any single parent who, out of necessity, works long hours at her business and must rely on the assistance of others to take care of her children.

Mr. Medina has not offered any "information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence" demonstrating that return is not appropriate. *See id.* at art. 13 (unnumbered final paragraph). Mr. Medina did not attempt to rely on an "affirmative defense" that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Id.* at art. 13b; *Acosta*, 725 F.3d at 875.[5] Similarly, there has

---

[5] Again, the inquiry on this affirmative defense is "narrow":

> [It] does not include an adjudication of the underlying custody dispute, and only requires assessment of whether the child will face immediate and substantial risk of an intolerable situation if he is returned to [his home country]

(Footnote continued . . .

been, and can be, no argument that the return of the children to Mexico "would not be permitted by the fundamental principles of the requested State [the United States] relating to the protection of human rights and fundamental freedoms," *id.* at art. 20.

Therefore, if return is to be denied, it must be on the basis of an Article 13a defense of "consent or acquiescence."

### 2. *"Consent or acquiescence" under Article 13a*

Mr. Medina expressly asserted affirmative defenses of "consent" and "acquiescence" pursuant to Article of the Convention and of ICARA. 1980 Hague Convention, art. 13a (stating that one defense to return is that "the person . . . having

> pending final determination of his parents' custody dispute. It is not relevant to this Convention exception who is the better parent in the long run, or whether [one parent] had good reason to leave her home ... and terminate her marriage to [the other parent]....

*Nunez–Escudero*, 58 F.3d at 377 (as quoted and altered in *Vasquez*, 648 F.3d at 650). Furthermore, this defense requires proof by clear and convincing evidence. 42 U.S.C. § 11603(e)(2). The Eighth Circuit Court of Appeals has explained that "[g]eneral evidence of harm is insufficient to satisfy Article 13b," but "[a] grave risk of harm may exist in cases involving 'serious abuse or neglect.'" *Acosta*, 725 F.3d at 875 (citing *Nunez-Escudero*, 58 F.3d at 376, for the first principle, and *Vasquez*, 648 F.3d at 650, for the second principle). More specifically, the Eighth Circuit Court of Appeals has "recognized two types of grave risk that are cognizable under Article 13(b): cases in which a child is sent to a zone of war, famine, or disease and those involving serious abuse or neglect." *Vasquez*, 648 F.3d at 650. Mr. Medina's allegations that Ms. Mendoza relies on others to provide much of the care of the children does not rise to the level of "abuse or neglect," and Mr. Medina has not alleged that Ms. Mendoza has physically abused the children or that she poses a threat of such physical abuse to the children, *see Acosta*, 725 F.3d at 876, although he has alleged that she has assaulted him and his mother.

the care of the person of the child . . had consented to or subsequently acquiesced in the removal or retention"). He must prove these affirmative defenses by "the preponderance of the evidence." 42 U.S.C. § 11603(e)(2). As Mr. Medina suggests, "consent" and "acquiescence" are separate affirmative defenses, where "consent" involves an agreement to removal or retention before the removal or retention occurred, and "acquiescence" is specifically identified in the 1980 Hague Convention as "subsequent acquiescence," that is, it considers agreement to the responding party's retention of the children after the retention occurred. *See, e.g., Gonzalez-Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir. 2001) (citing, *inter alia, Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996)). "Of course, conduct after removal can be useful in determining whether consent was present at the time of removal." *Id.*

I noted, above, in Section II.B.4., beginning on page 14, that the only circumstantial evidence that Mr. Medina offered in support of a "consent" affirmative defense were some text messages that the parties do not dispute that Ms. Mendoza sent to Mr. Medina on May 12, 2012, although the parties do dispute both the significance and the translation of these text messages, and I set out their differing translations, above. I find credible Ms. Mendoza's explanation of the text messages as a momentary venting of frustration, and that they are not an indication that she ever agreed to or wanted permanent transfer of the children to the United States. Moreover, I reiterate my conclusion that these text messages, by themselves, do not constitute consent by Ms. Mendoza, before the removal or retention of the children, to a permanent transfer of the two older children to the United States, and that there is no other sufficient evidence for me to conclude that Ms. Mendoza consented to the permanent transfer of the children to Mr. Medina's custody in the United States. Furthermore, I find from Ms. Mendoza's requests for permission to take the children out of daycare and preschool for six weeks to two months to accommodate their visit to the United States

starting in December 2012; her insistence upon return of the children on February 2, 2013, during the conciliation meeting; her traveling to the agreed meeting place for return of the children on February 2, 2013, notwithstanding Mr. Medina telling her not to bother doing so; and her prompt attempt to engage the assistance of the United States State Department in obtaining the return of the children, by filing a Request For Return Of Children through the Mexican Central Authority on March 6, 2013, to which she attached the mediation transcript from December 2012, all indicate that Ms. Mendoza had not consented to a permanent transfer of the children to the United States. *See Gonzalez-Caballero*, 251 F.3d at 794 (noting that "conduct after removal can be useful in determining whether consent was present at the time of removal").

Nor can I find that Mr. Medina has proved "acquiescence" by Ms. Mendoza after the removal and retention of the children by the preponderance of the evidence. Mr. Medina appeared to base his "acquiescence" affirmative defense on his contention that Ms. Mendoza did not attempt to contact him or any of his family members after January 2013. I find that the credibility of Mr. Medina's contention that Ms. Mendoza did not attempt to get in contact with him or the children or his family members after he retained the children to be completely undermined by Ms. Mendoza's evidence that she made repeated attempts to call and e-mail Mr. Medina and that she did not have a current telephone number or address for him or the children. Her testimony on this point is confirmed by Mr. Medina's own admissions that he changed his telephone number in January 2013 without notifying Ms. Mendoza of the change; that he and his family moved to a new address in Storm Lake in August 2013, again without notifying Ms. Mendoza of his new address; his admission that he "rarely" looked at his e-mail or his "facebook" page, after he asserted that they were adequate means for Ms. Mendoza to contact him; and his unsubstantiated suggestion that Ms. Mendoza's e-mails to him might have been filtered into a "junk" file. I conclude that Mr. Medina simply cannot

rely on an "acquiescence" defense, where I find that the evidence shows that he actively thwarted Ms. Mendoza's attempts to contact him or the children. Moreover, Ms. Mendoza's protests at Mr. Medina's statement that she need not bother to come to the border on February 2, 2013, to get the children; her actually going to the border to get the children on February 2, 2013, when they did not appear; her prompt efforts, beginning March 6, 2013, to obtain return of the children by submitting a Request For Return Of Children to the United States Department of State through the Mexican Central Authority; her pursuit of legal assistance both in Mexico and in the United States; and her prosecution of this action undermine Mr. Medina's contention that Ms. Mendoza simply "acquiesced," after the fact, to his failure to return the children as agreed on February 2, 2013, or his retention of the children thereafter in the United States.

Therefore, I reject Mr. Medina's "consent or acquiescence" affirmative defenses to return of the children to Mexico.

### *3.* *Summary*

Because I find that Mr. Medina has not offered sufficient proof on any affirmative defense, the "rule of return" is applicable here. *See* 1980 Hague Convention, art. 12; *Chafin*, ___ U.S. at ___, 133 S. Ct. at 1021; *Acosta*, 725 F.3d at 875; *Barzilay II*, 600 F.3d at 917.

### *D.* *Mr. Medina's Request For A Delay In The Return Of The Children*

Mr. Medina requested that, if I order return of the children, I at least stay their return until after they have completed the school year, and that he be allowed to accompany them to the border to return them to their mother. I construe Mr. Medina's first request as a request to stay any order for return of the children. As I noted,

above, in my November 27, 2013, Order (docket no. 24) regarding possible disposition after the second day of trial and preliminary injunction hearing, I explained that, if I ordered the return of the children to Mexico, as requested by Ms. Mendoza, I would not order their return immediately, but neither would I stay such an order pending appeal. Rather, I would stay any order for return long enough for Mr. Medina to file an appeal and to attempt to obtain a stay pending appeal from the Eighth Circuit Court of Appeals. I also explained that, even if I decided to grant Ms. Mendoza the requested relief of return of the children to Mexico, I would not order the immediate transfer of the children to the custody of Ms. Mendoza or her designee.

As to a stay pending appeal in an ICARA case, the United States Supreme Court has explained that,

> Courts should apply the four traditional stay factors in considering whether to stay a return order [pursuant to ICARA]: "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Nken v. Holder*, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987)). In every case under the Hague Convention, the well-being of a child is at stake; application of the traditional stay factors ensures that each case will receive the individualized treatment necessary for appropriate consideration of the child's best interest.

*Chafin*, ___ U.S. at ___, 133 S. Ct. at 1027.[6]

Here, I do not find that Mr. Medina has made a strong showing that he is likely to succeed on the merits of an appeal of the order for return, even though I found this to be a close case in some respects, because my ultimate decision was based on credibility determinations.    *Id*. at (first element).    Moreover, I conclude that Mr. Medina will not be irreparably injured absent a stay of the order for return.    *Id*. (second element).    As the Supreme Court suggested, albeit when considering "mootness," a responding party's claim for relief on appeal consisting of an order for "re-return," whether "under the Convention itself or according to general equitable principles" simply is not so "implausible" as to be nugatory.    *Id*. at 1024. Furthermore, "even if [Mexico] were to ignore a U.S. re-return order [after a successful appeal by Mr. Medina], or decline to assist in enforcing it," United States courts "continue to have personal jurisdiction over [Ms. Mendoza], may continue to command her to take action even outside of the United States, and may back up any such command with sanctions."    *Id*.    Similarly, issuance of a stay would "substantially injure the other parties interested in the proceeding," *id*. at 1027 (third element), because it could result in the children losing precious time when they could be readjusting to life in Mexico.    *See id*.    Finally, the Convention and ICARA demonstrate a public interest in expeditious resolution of petitions for return of children, "for the sake of the children who find themselves in such an unfortunate situation."    *Id*.    The Supreme Court noted that an average case in American courts takes over two years

---

[6] The Court has also held that the return of the children to their state of habitual residence does not "moot" an appeal of the order for return.    *Id*. at ___, 133 S. Ct. at 1025-26.

from filing to resolution, which is a significant portion of the lives of the four- and five-year-old children involved in this case. *Id*. at 1028. Thus, the pertinent factors weigh against a stay pending appeal of the order for return in this case. Therefore, I will not grant a stay of the order for return of the children pending appeal.

For many of the same reasons, I will not stay or delay an order of return until the children complete the school year, as Mr. Medina has expressly requested. Again, doing so would result in the children losing precious time when they could be readjusting to life in Mexico and would be contrary to the public interest in expeditious resolution of petitions for return of the children, for their sake. I reiterate that the only delay in return of the children that I am willing to grant is a delay that is long enough for Mr. Medina to file an appeal and to attempt to obtain a stay pending appeal from the Eighth Circuit Court of Appeals. Therefore, I will delay the deadline for return of the children for thirty days from the date of this order, subject to a motion by either party requesting an additional extension for good cause.

I am more sympathetic to Mr. Medina's request that he be allowed to take the children to the United States/Mexico border to return them to Ms. Mendoza, rather than some designee of Ms. Mendoza. I do not believe that it makes a difference, legally, whether I order Mr. Mendoza to return the children to a designee of Ms. Mendoza's on a particular date, or order Mr. Medina himself to return the children to Ms. Mendoza at the United States/Mexico border in Nuevo Laredo, Mexico. To the limited extent that I am allowed to consider the best interests of the children at all in these proceedings, I believe that the best interests of the children will be served by allowing them to travel with their father, rather than a designee of Ms. Mendoza's, who is likely to be a stranger to them, to the point of transfer back to their "habitual

residence" in Mexico.[7]  Therefore, I will grant Mr. Medina's request by ordering that he return the children, at a date and time certain, to Ms. Mendoza's custody at the United States/Mexico border in Nuevo Laredo, Mexico.

### III.    CONCLUSION

Upon consideration of all of the evidence presented at the consolidated trial and preliminary injunction hearing, I conclude that Ms. Mendoza is entitled to return of K.G.M.A. and M.K.M.A. to Mexico "forthwith."  1980 Hague Convention, art. 12.

THEREFORE,

1.    The minor children, K.G.M.A. and M.K.M.A., shall be transferred to the custody of Ms. Mendoza by Mr. Medina at the United States/Mexico border in Nuevo Laredo, Mexico, not later than 12**:00 p.m. (noon) on January 10, 2014**, unless this order of return is stayed pending appeal by the Eighth Circuit Court of Appeals.  It is apparent that the parties have had difficulty communicating effectively.  Therefore, I encourage the parties to find a workable channel of communications to coordinate the transfer of the children, and if they have difficulties doing so, I request that counsel make themselves available by telephone or e-mail to facilitate communications between the parties and the transfer of the children.

2.    Mr. Medina is enjoined from removing the children from the jurisdiction of this court and to permit reasonable telephone contact by Ms. Mendoza with the children, and the Clerk of Court shall retain the passports and travel documents of

---

[7] Indeed, while I am not to determine the best interests of the children, I can say that, on the evidence presented in these proceedings, I have no doubt that Mr. Medina is an excellent parent.  I cannot say the same, with a similar degree of certainty, of Ms. Mendoza.

K.G.M.A. and M.K.M.A., until and unless I grant a motion by Mr. Medina to obtain the children's passports and travel documents to allow him to comply with the order for return of the children to the custody of Ms. Mendoza.

**IT IS SO ORDERED**.

**DATED** this 10th day of December, 2013.

MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA